## Staunton

WILLIAM L. STURMAN AND MAX STURMAN v. WALTER F. JOHNSON.

September 6, 1968.

Record No. 6773.

Present, Eggleston, C.J., Buchanan, Snead, I'Anson, Carrico, and Gordon, JJ.

*George E. Allen, Sr.; Leonard B. Sachs (H. Lee Kanter; Kanter & Kanter; Allen, Allen, Allen & Allen, on brief), for plaintiffs in error.*

*William B. Eley* (*Rixey and Rixey,* on brief), for defendant in error.

CARRICO, J., delivered the opinion of the court.

The infant plaintiff, William L. Sturman, by his father and next friend, Max Sturman, filed a motion for judgment seeking to recover damages for personal injuries allegedly sustained by him in an automobile accident. The motion alleged that Walter F. Johnson, the defendant, was the operator of the vehicle; that the infant plaintiff was "a passenger for pay" in the automobile; and that his injuries were caused by the "negligence and . . . gross negligence" of the defendant.

The infant plaintiff's father, Max Sturman, also filed a motion for judgment against the defendant, seeking recovery of the expenses incurred in the treatment and care of his son's injuries.

The two actions were consolidated and were tried together before a jury. At the conclusion of the plaintiff's evidence, the trial court granted the defendant's motion to strike the evidence and entered summary judgment in favor of the defendant. The plaintiffs were granted a writ of error.

The accident occurred sometime after 10:30 p.m. on October 4, 1964, when the infant plaintiff and the defendant, who were students at the University of Virginia, members of the same fraternity, and roommates at the fraternity house, were driving back to school after returning their dates to the latter's dormitory at Richmond Professional Institute, following a dance weekend in Charlottesville.

The circumstances surrounding the making of the trip present the first question for decision, and that is: Was the plaintiff's evidence sufficient to submit to the jury the issue of whether the infant plaintiff was a paying passenger in the automobile operated by the defendant and thus entitled to recover for only ordinary negligence?

The defendant was engaged to the young lady who was his date for the weekend, and through her, a "blind date" with her roommate was arranged for the infant plaintiff. The two girls had planned to take a bus back to Richmond on Sunday afternoon, but for some reason failed to do so. The defendant then borrowed a car to drive the girls back to their school. He was familiar with the vehicle, having driven it on a number of occasions.

After obtaining the car, the defendant went to the fraternity house and asked the infant plaintiff to make the trip with him. The

infant plaintiff "had not originally wanted to go . . . at all" because he "had not particularly liked his date." The defendant, however, urged the infant plaintiff to go because he thought "it would be the proper thing for [the infant plaintiff] to do to ride along and escort his date back." The infant plaintiff apparently "thought so too because he agreed to go."

On direct examination, the infant plaintiff was asked to relate the discussion he had with the defendant "as to the arrangements for taking" the two girls "back to Richmond." He replied:

"Well, I felt it more or less my obligation to ride back with her since she was my—had been my date for the weekend, and of course Walter, Mr. Johnson, wanted to be with his fiancee, and as was customary with fraternity brothers, we always split costs on these trips."

The following questions and answers then ensued:

"Q. Did you actually agree on that with him in the room when he came up there?
"A. Well, yeah, we made a—well, I told him that I would pay my half or pay for half the gas.
"Q. All right. Did you have any money on you at all at that time in the fraternity house?
"A. Some change in my pocket.
"Q. And what arrangements did you make with Walter as to how you were going to pay him for your half share of the expenses of taking the girls down and bringing [you] back?
"A. On the return I was to write him a check to pay for my half of the expenses."

On cross-examination, the infant plaintiff was asked:

"Q. Now, as a matter of fact, any idea about any paying back any gas was never actually said . . . you never said anything to him, but you only intended to contribute. Isn't that what actually happened?"

The infant plaintiff's answer was:

"A. Oh, I came out and told him that I would pay for my half of the expenses, and I told him—because I didn't have much money when he asked me if I wanted to go I told him that

I didn't have much cash but I would pay him when we returned."

The infant plaintiff was also asked if he made any other statement concerning expenses, and he replied, "it was pretty well understood on both our parts that I was to pay the expenses when we returned to Charlottesville."

The defendant, called as an adverse witness by the plaintiffs, denied that he had discussed with the infant plaintiff the proposition that they "were going to split expenses for this trip."

The question now before us arises from the operation of Code, § 8-646.1 which provides, so far as is pertinent here, as follows:

"No person transported by the owner or operator of any motor vehicle as a guest without payment for such transportation . . . shall be entitled to recover damages against such owner or operator for . . . injuries to the person . . . of such guest resulting from the operation of such motor vehicle, unless such . . . injury was caused or resulted from the gross negligence . . . on the part of such owner or operator."

Since enactment of the above statute in 1938, we have on numerous occasions been called upon to decide the question of whether a plaintiff was a "guest without payment" within the meaning of the statute and required to prove gross negligence, or a paying passenger entitled to recover for only ordinary negligence.

The defendant contends that one of our prior decisions, *Davis v. Williams*, 194 Va. 541, 74 S. E. 2d 58 (1953), "is dispositive of the issue under consideration." His reliance upon that case is mistaken, however, because there we held as a matter of law that the plaintiff was a paying passenger. The evidence was that the plaintiff, a school teacher, voluntarily contributed the equivalent of weekly bus fare for transportation to and from school in the defendant's automobile, although not requested to do so by the defendant.

The present defendant's reliance upon the *Davis* case apparently stems from the fact that in the opinion we noted that the Supreme Court of Michigan had applied our guest statute in the case of *Bushouse v. Brom*, 297 Mich. 616, 298 N. W. 303 (1941), involving an accident occurring in Virginia.

The plaintiff in the Michigan case, after being invited to accom-

pany the defendant and her mother on a trip, stated that she would pay half the expenses. Her offer was not refused by the defendant, but the latter claimed that she only intended that the plaintiff should pay a third of the expenses.

It was shown that the three ladies making the trip did establish what they called the "Company's purse," each placing money in a purse from which the expenses of the trip were paid as demanded. At the time of the accident, approximately $80 had been placed in the purse, of which amount plaintiff had contributed $30; all but a few dollars had been spent.

The Michigan court stated that its guest statute was, in effect, the same as ours; that our decisions indicated that we had construed our statute in like manner as it had construed Michigan's; and that it would, therefore, "interpret and enforce the law as [had] already been done in" that state. 298 N. W., at 305.

One of our cases referred to by the Michigan court was *Gale* v. *Wilber*, 163 Va. 211, 217, 175 S. E. 739, 741 (1934), where we had observed, "The term 'passenger,' in its legal sense, imports some contractual relation between the parties."

The Michigan court said of the foregoing passage: "There is little, if any, room for controversy concerning the quoted proposition; but it would be applicable only when a legally binding contractual relation was established." 298 N.W., at 304. The court held that the plaintiff was a guest and not a paying passenger because "there was never any definite understanding between these parties which resulted in an 'express legal obligation to pay.' " 298 N. W., at 305.

At the time the *Bushouse* case was decided by the Michigan court, we had not had occasion to apply our guest statute in a similar factual situation. However, since that time and, in fact, since our decision in *Davis* v. *Williams, supra,* where we took note of *Bushouse,* we have had two similar situations before us; and in each instance arrived at a result different from that reached by the Michigan court.

Thus, in *Gammon* v. *Hyde*, 199 Va. 918, 924-925, 103 S. E. 2d 221, 226 (1958), we held the plaintiff to be a paying passenger where, before starting on a trip to a church convention in Iowa, the passengers contributed $50 each to defray part of the expense of operating the defendant's car, although there was "no requirement by [the defendant] or specific agreement between him and his passengers that this contribution be made." 199 Va., at 925, 103 S. E. 2d, at 226.

And, in *Bernard* v. *Bohanan*, 203 Va. 372, 375-376, 124 S. E. 2d 191,

194 (1962), we held that the plaintiff was a paying passenger where the parties, before starting on a pleasure trip, agreed to establish a "kitty" to defray the expense of operating the defendant's automobile, each party originally contributing $5 to the fund, which was kept in a separate pocketbook, and then adding equal contributions when the "kitty" needed replenishing.

In the *Bernard* case, we said, "The benefit defendant received amounted to more than gratuitous gestures or social amenities. It was a consideration for the transportation." 203 Va., at 376, 124 S. E. 2d, at 194.

When that criterion is applied to the case before us and the infant plaintiff's testimony is accepted, for the time being, as true, the situation is presented where the parties, by pre-trip arrangement, provided that the infant plaintiff would compensate the defendant for one-half the expenses of operating the car on the trip. This would have been more than a mere social or incidental benefit to the defendant; it would have constituted a substantial pecuniary contribution to help defray such expenses, placing the infant plaintiff in the status of a paying passenger.

The defendant, as has been noted, denied that any such arrangement was made, and the resulting conflict posed a typical jury question.

The next question for decision is: Was the plaintiffs' evidence sufficient to submit to the jury the issues of whether the defendant was guilty of ordinary negligence, if the infant plaintiff was found to be a passenger, or of gross negligence, if he was found to be a guest?

As has already been stated, the accident occurred sometime after 10:30 p.m. on October 4, 1964. It had rained earlier in the evening, but at the time of the accident, the weather was clear and the road surface was dry.

The accident took place on U. S. Route 250 near its intersection with University Airport Road, seven miles east of the city of Charlottesville and ten miles west of Zion Crossroads. Route 250 runs east and west. The oral testimony and photographic exhibits of the accident scene show that a vehicle traveling in a westerly direction passes a highway sign indicating a curve to the right and a maximum safe speed of 50 m.p.h.; proceeds upgrade through an area where the road is three lanes in width but lined for no passing by westbound traffic; encounters a sharp curve to the right, marked by reflectors, at

the top of the grade where traffic is channeled by lines painted in the middle of the road to one lane in each direction; and then passes over a bridge above the Chesapeake and Ohio railway tracks. The Airport Road intersects Route 250 from the south or left about at the apex of the curve.

On the return trip from Richmond to Charlottesville, the automobile operated by the defendant and occupied by the infant plaintiff ran out of gas several miles west of Zion Crossroads. The defendant left his companion in the car and hitchhiked a ride back to Zion Crossroads, where a combination restaurant and filling station was still open. He secured a gallon of gasoline in a jar, and the operator of the establishment drove him back to his car, where the gas was poured into the tank.

The infant plaintiff and the defendant then returned to the filling station, secured more gas, and each had a cup of coffee. An employee of the restaurant observed the defendant on both his visits, and described him as "very polite and . . . wide awake."

The two young men re-entered their car and, with the defendant driving, continued the trip to Charlottesville. The infant plaintiff fell asleep and was awakened by the noise of the "wind whistling in through the window and the car . . . rattling." He testified that the vehicle "was rattling violently as if it was traveling at a high rate of speed."

The infant plaintiff "looked at the speedometer and . . . noticed that the speedometer needle was somewhere in the vicinity of ninety miles an hour." He looked at the defendant and saw that the latter was awake. He "turned to protest" to the defendant, and "about that time," the vehicle "hit something."

The car ran off the left side of the pavement where the highway curves to the right at the intersection of Route 250 and the University Airport Road. It traveled approximately 190 feet on the shoulder of the road, knocking over two 6" x 6" highway marker posts; went over a 100-foot cliff and sailed approximately 240 feet through the air, clipping off the tops of some tall trees; then struck the trunk of a large tree and fell to the ground, turned in the opposite direction from which it had come. The vehicle was demolished, and parts of it "flew off" when it hit the tree.

The infant plaintiff was found 20 to 30 feet beyond the car, "in the honeysuckle." The defendant crawled up the bank and was found

sitting on the edge of the highway at the west end of the bridge over the railroad tracks.

The defendant had no recollection of the events which occurred after he left the filling station at Zion Crossroads. He did remember that "prior to reaching Zion's Crossroads [he] had done some speeding . . . eighty miles an hour."

The infant plaintiff contends that the evidence was sufficient to take his case to the jury upon either theory of negligence relied upon by him, that is, ordinary negligence if he was a passenger, or gross negligence if he was a guest.

The defendant, on the other hand, contends that the evidence was sufficient to sustain neither theory. He says that there was no evidence as to "what caused the automobile to reach" the speed of 90 miles per hour ascribed to it by the infant plaintiff or as to what caused the vehicle to leave the highway. Thus, he argues, it was not shown how and why the accident happened, and the jury could only have speculated about the cause.

It is true that we have said, in cases which need not be enumerated here, that if it cannot be determined how and why an accident occurred, there can be no recovery. But we know of no rule, and can perceive of no reason to establish one, imposing upon a plaintiff the burden of proving what caused an automobile to travel at a particular speed where, as here, there is direct evidence showing that a certain speed was attained and that the driver was awake. In such circumstances, it will be assumed, until the contrary appears, that a vehicle traveled at a particular speed because the driver voluntarily caused it to do so.

The parties have cited numerous cases in support of their respective positions on the negligence question, none of which, however, is controlling. Not cited is a case which is controlling, and that is *Leech* v. *Beasley*, 203 Va. 955, 128 S. E. 2d 293 (1962).

In the *Leech* case, the accident occurred on an "S" curve, the first portion thereof bearing to the right and the second to the left. Reflecting highway markers warned of the presence of the curve and indicated a maximum safe speed of 50 miles per hour.

The vehicle operated by Leech entered the first portion of the curve at a speed of 75 miles per hour, and its speed was then accelerated to "80 or 85 or 90" miles per hour. It failed to make the second or left-hand portion of the curve, ran off the road to the right, traveled 250 feet, knocked down a highway sign, proceeded another

110 feet and came to rest 62 feet from the edge of the road at the bottom of a 50-foot embankment, pointed in the opposite direction from which it had come.

We said in the *Leech* case, in sustaining the jury's finding of gross negligence, "Here, the jury could point directly to how and why this accident took place. Under the evidence presented to it, the jury could have found that Leech, with an utter lack of a sense of caution, entered a dangerous curve, heedless of the warnings displayed," at a grossly excessive rate of speed and, "as a result thereof, was unable to control the vehicle and to complete the curve, thus causing it to run off the road and crash." 203 Va., at 963, 128 S. E. 2d, at 298.

The same can be said about the case now before us. Under the plaintiff's evidence, the jury, if the matter had been presented to it, could have found that the accident occurred because the defendant foolheartedly tried to negotiate the hazardous curve at a highly excessive rate of speed and, as the result thereof, could not make the curve and lost control of the vehicle, causing it to run off the highway and crash.

Negligence and gross negligence have been so often defined that the meaning of the terms should need little elucidation here. Negligence is the failure to use ordinary care. Gross negligence is that degree of negligence which shows an utter disregard of prudence amounting to complete neglect for the safety of another.

The conduct of the defendant in this case, if the plaintiff's evidence is believed, was such as to come within the definition of gross negligence and, accordingly, within the definition of ordinary negligence. The issues of whether the defendant was guilty of ordinary negligence, if the infant plaintiff was found to be a passenger, or of gross negligence, if he was found to be a guest, should have survived the motion to strike the evidence.

 ˙ The parties say that there is a final question for us to decide, and that is whether the provisions of Code, § 8-286,[1] the so-called Dead Man's Statute, are applicable to the case at bar.

---

[1] "§ 8-286. *Corroboration required and evidence receivable when one party incapable of testifying.*—In an action or suit by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony; and in any such action or suit, if such adverse party testifies, all entries, memoranda, and declarations by the party so incapable of testifying made while he was capable, relevant to the matter in issue, may be received as evidence."

The claim is that as a result of the accident, the defendant suffered retrograde amnesia and could not recollect the details of the accident. This condition, he contends, rendered him incapable of testifying within the meaning of the Dead Man's Statute, and thus corroboration of the infant plaintiff's testimony was required.

It is, of course, difficult to see how this question arises, since the evidence was struck at the conclusion of the plaintiff's case, and the defendant submitted no evidence showing that he suffered retrograde amnesia. True, he testified as an adverse witness, at the call of the plaintiffs, and claimed not to remember the circumstances of the accident. But he laid his loss of memory to another factor, "gasoline fume influence," caused by some fuel spilling on him when he tried to pour it into his gas tank.

There was some medical testimony submitted in the trial below about retrograde amnesia, but that related to the infant plaintiff, who was unable to recall the details of the accident until many months after it occurred. The testimony showed that retrograde amnesia results from a head injury and causes the patient to be unable to recall "the actual details" of an incident for "a long time."

All that is in the record about the defendant's being incapable of testifying appears from the argument on the motion to strike the evidence. Counsel for the defendant, after citing Code, § 8-286 to the trial court, said, "And this defendant is incapable of testifying." The trial judge then commented, "And that testimony they [plaintiffs] rely on comes under that statute." This is hardly the way for counsel to raise and present a question for appellate decision.

However, since the case has to be retried, and so that this question will not be tiresomely litigated, we will lay it to rest.

If it had been shown that the defendant suffered retrograde amnesia and so could not remember how the accident occurred, it was, nonetheless, unnecessary that the infant plaintiff's testimony be corroborated. The Dead Man's Statute simply does not apply to this type of case.

The defendant was not incapable of testifying. He did testify, at length, in the court below. He was merely unable, supposedly, to recall the actual details of the accident. That is not, in our opinion, such an incapability as is envisioned by the statute.

Moreover, in *John Doe* v. *Faulkner*, 203 Va. 522, 525, 125 S. E. 2d 169, 171 (1962), we said:

"Section 8-286 was adopted to provide protection for estates of *persons* laboring under disability, or who are *incapable* of testifying. . . ."

The defendant here was neither dead nor, so far as we know, had he been adjudged incompetent; and no committee, trustee, executor, administrator, or other representative had been appointed for him. He was not, therefore, in the status of such a "person" as is entitled to the protection of the statute.

For the error in striking the plaintiffs' evidence, we will reverse the judgments of the trial court and remand the cases for new trials not inconsistent with the views expressed in this opinion.

*Reversed and remanded.*